UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ X

MICHAEL SCHNEIDER, :
:
            Plaintiff, :
:
     -against- :
:
DERMIRA, INC., THOMAS G. WIGGANS, :
EUGENE A. BAUER, DAVID E. COHEN, :
FRED CRAVES, MATTHEW FUST, :
HALLEY E. GILBERT, MARK MCDADE, :
JAKE NUNN, WILLIAM RINGO, and :
KATHLEEN SEBELIUS, :
:
          Defendants. :

------------------------------------------ X

CASE NO.: _____

COMPLAINT

JURY TRIAL DEMANDED

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

      Plaintiff Michael Schneider ("Plaintiff"), on behalf of himself, by and through his

attorneys, alleges the following upon information and belief, including investigation of counsel

and review of publicly available information, except as to those allegations pertaining to

Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

      1.     This is an action brought by Plaintiff against Dermira, Inc. ("Dermira" or the

"Company") and the members of the Company's board of directors (collectively referred to as the

"Board" or the "Individual Defendants" and, together with Dermira, the "Defendants") for their

violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States

Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-

9"). Plaintiff's claims arise in connection with the tender offer by Eli Lilly and Company and its

affiliates ("Lilly").

2.      On January 10, 2020, Dermira entered into an Agreement and Plan of Merger (the "Merger Agreement") with Lilly and Bald Eagle Acquisition Corporation ("Merger Sub", a Delaware corporation and wholly owned subsidiary of Lilly).  Pursuant to the Merger Agreement, Merger Sub will be merged with and into Dermira, with Dermira continuing as the surviving entity and wholly owned subsidiary of Lilly (the "Tender Offer").

3.      Under the terms of the Merger Agreement, each stockholder of Dermira common stock will be entitled to receive $18.75 in cash per share of common stock (the "Offer Price").

4.      On January 22, 2020, in order to convince Dermira's public common stockholders to tender their shares, Defendants authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the SEC.

5.      In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the valuation analyses performed by Dermira's financial advisors, Citigroup Global Markets, Inc. ("Citi") and SVB Leerink LLC ("SVB Leerink"), in support of their fairness opinions; and (ii) whether Demira entered into confidentiality agreements with other potential bidders, including whether those agreements contained "don't ask, don't waive" ("DADW") clauses and whether those clauses were waived.

6.      The Tender Offer is scheduled to expire one minute after 11:59 p.m., Eastern Time, on February 19, 2020 (the "Expiration Time"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's stockholders prior to the Expiration Time so they can properly determine whether to tender their shares.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act and Rule

14d-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Tender Offer

unless and until the material information discussed below is disclosed to Dermira's public common

stockholders sufficiently in advance of the special meeting of the Company's stockholders or, in

the event the Tender Offer is consummated, to recover damages resulting from the Defendants'

violations of the Exchange Act.

### JURISDICTION AND VENUE

7.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of

the 1934 Act because the claims asserted herein arise under Sections 14(d)(4), 14(e), and 20(a) of

the Exchange Act and Rule 14d-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant

conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District as to render the exercise of jurisdiction over each Defendant by this Court permissible

under the traditional notions of fair play and substantial justice.  "Where a federal statute such as

Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes

whether the party has sufficient contacts with the United States, not any particular state."  *Sec.

Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has

minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over

the defendant in any federal district court."  *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact

business in this District.  Indeed, Dermira's common shares trade on the Nasdaq, which is also

headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir.

2003) (collecting cases).

## PARTIES

10.     Plaintiff is, and has been continuously throughout all times relevant hereto, the holder of Dermira common shares.

11.     Defendant Dermira, Inc. is a Delaware corporation. The address of Dermira's principal executive office is 275 Middlefield Road, Suite 150, Menlo Park, California, 94025. Demira's common shares trade on the Nasdaq under the ticker "DERM."

12.     Defendant Thomas G. Wiggans is, and has been at all relevant times, the Company's Co-Founder, Chief Executive Officer, and Chairman of the Board of Directors.

13.     Defendant Eugene A. Bauer is, and has been at all relevant times, the Company's Co-Founder, Chief Medical Officer, and a director.

14.     Defendant David E. Cohen is, and has been at all relevant times, a director of the Company.

15.     Defendant Fred Craves is, and has been at all relevant times, a director of the Company, as well as an investment partner as the Managing Director and co-founder of Bay City Capital.

16.     Defendant Matthew Fust is, and has been at all relevant times, a director of the Company.

17.     Defendant Halley E. Gilbert is, and has been at all relevant times, a director of the Company.

18.     Defendant Mark McDade is, and has been at all relevant times, a director of the Company.

19.     Defendant Jake Nunn is, and has been at all relevant times, a director of the

Company.

20.     Defendant William Ringo is, and has been at all relevant times, a director of the Company.

21.     Defendant Kathleen Sebelius is, and has been at all relevant times, a director of the Company.

22.     The defendants identified in paragraphs 12 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Dermira, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Tender Offer**

23.     Dermira is a biopharmaceutical company which combines biotech developments with medical dermatology to deliver new therapies to patients living with chronic skin conditions. Dermira provides services to both patients and physicians, and attempts to identify, develop and commercialize medical dermatology products. The company's approved treatment, QBREXZA (glycopyrronium) cloth, is indicated for pediatric and adult patients (ages 9 and older) with primary axillary hyperhidrosis (excessive underarm sweating).

24.     Lilly discovers, develops, manufactures, and markets pharmaceutical products worldwide. Lilly operates in two segments, Human Pharmaceutical Products and Animal Health Products.

25.     On January 10, 2020, Dermira issued a press release announcing the Tender Offer, which stated in relevant part:

**Lilly Announces Agreement to Acquire Dermira**

*01/10/2020*
INDIANAPOLIS and MENLO PARK, Calif., Jan. 10, 2020 /PRNewswire/
-- Eli Lilly and Company (NYSE: <u>LLY</u>) and Dermira, Inc.
(NASDAQ: <u>DERM</u>) today announced a definitive agreement for Lilly to
acquire Dermira for $18.75 per share, or approximately $1.1 billion, in an
all-cash transaction. Dermira is a biopharmaceutical company dedicated to
developing new therapies for chronic skin conditions.

The acquisition will expand Lilly's immunology pipeline with the addition
of lebrikizumab, a novel, investigational, monoclonal antibody designed to
bind IL-13 with high affinity that is being evaluated in a Phase 3 clinical
development program for the treatment of moderate-to-severe atopic
dermatitis in adolescent and adult patients, ages 12 years and older.
Lebrikizumab was granted Fast Track designation from the U.S. Food and
Drug Administration (FDA) in December 2019. The acquisition of Dermira
will also expand Lilly's portfolio of marketed dermatology medicines with
the addition of QBREXZA® (glycopyrronium) cloth, a medicated cloth
approved by the FDA for the topical treatment of primary axillary
hyperhidrosis (uncontrolled excessive underarm sweating).

"People suffering from moderate-to-severe atopic dermatitis have
significant unmet treatment needs, and we are excited about the potential
that lebrikizumab has to help these patients," said Patrik Jonsson, Lilly
senior vice president and president of Lilly Bio-Medicines "The acquisition
of Dermira is consistent with Lilly's strategy to augment our own internal
research by acquiring clinical phase assets in our core therapeutic areas and
leveraging our development expertise and commercial infrastructure to
bring new medicines to patients. This acquisition provides an opportunity
to add a promising Phase 3 immunology compound for atopic dermatitis,
while also adding an approved dermatology treatment for primary axillary
hyperhidrosis. We look forward to completing the acquisition and
continuing Dermira's excellent work."

"Since Dermira's inception, we have been focused on applying strong
science to medical dermatology with the goal of finding new ways to treat
some of the most common skin conditions that affect millions of people
every year," said Tom Wiggans, chairman and chief executive officer at
Dermira. "We are pleased that Lilly has recognized the progress we have
made and the opportunities for lebrikizumab and QBREXZA. We share
with Lilly a common interest in helping patients through the development
of innovative treatments and believe that patients and physicians will
benefit from the resources that Lilly can bring to maximize the potential of
our programs. We also believe this proposed transaction is in the best
interests of Dermira and our stockholders and affirms the dedication and

important groundwork established by Dermira's talented employees since the founding of the company nearly 10 years ago."

Under the terms of the agreement, Lilly will commence a tender offer to acquire all outstanding shares of Dermira, Inc. for a purchase price of $18.75 per share in cash, or approximately $1.1 billion. The transaction is not subject to any financing condition and is expected to close by the end of the first quarter of 2020, subject to customary closing conditions, including receipt of required regulatory approvals and the tender of a majority of the outstanding shares of Dermira's common stock. Following the successful closing of the tender offer, Lilly will acquire any shares of Dermira that are not tendered into the tender offer through a second-step merger at the tender offer price.

The purchase price represents a premium of approximately 86 percent to the 60-day volume-weighted average trading price of Dermira's stock ending on January 9, 2020, the last trading day before the announcement of the transaction. Dermira's Board of Directors unanimously recommends that Dermira's stockholders tender their shares in the tender offer. Additionally, certain Dermira stockholders, beneficially owning approximately 13 percent of Dermira's outstanding common stock, have agreed to tender their shares in the tender offer.

This transaction will be reflected in Lilly's financial results and financial guidance according to Generally Accepted Accounting Principles (GAAP). Lilly will provide an update to its 2020 financial guidance, including the expected impact from the acquisition of Dermira, as part of its fourth-quarter and full-year 2019 financial results announcement on January 30, 2020.

For Lilly, Evercore is acting as the exclusive financial advisor and Weil, Gotshal & Manges LLP is acting as legal advisor in this transaction. For Dermira, Citi is acting as lead financial advisor, SVB Leerink is acting as financial advisor, and Fenwick & West LLP is acting as legal advisor.

**About Lebrikizumab**

Lebrikizumab is a novel, investigational, monoclonal antibody designed to bind IL-13 with very high affinity, specifically preventing the formation of the IL-13Rα1/IL-4Rα heterodimer complex and subsequent signaling, thereby inhibiting the biological effects of IL-13 in a targeted and efficient fashion. IL-13 is believed to be a central pathogenic mediator that drives multiple aspects of the pathophysiology underlying the range of signs and symptoms of atopic dermatitis by promoting type 2 inflammation and mediating its effects on tissue, resulting in skin barrier dysfunction, itch, skin thickening and skin pain.

**About QBREXZA® (glycopyrronium) cloth**

QBREXZA (pronounced kew brex' zah) is an anticholinergic indicated for topical treatment of primary axillary hyperhidrosis in adult and pediatric patients 9 years of age and older. QBREXZA is applied directly to the skin and is designed to block sweat production by inhibiting sweat gland activation.

**The Recommendation Statement Omits Material Information**

26.     On January 22, 2020, Defendants filed a materially incomplete and misleading Recommendation Statement with the SEC.  The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to determine whether to tender their shares.

27.     *First*, the Recommendation Statement fails to disclose crucial information concerning the summaries of Citi's and SVB Leerink's financial analyses, so used in creating their fairness opinions.

28.     With respect to Citi's *Discounted Cash Flow Analysis*, the Recommendation Statement is materially misleading and incomplete because it fails to disclose: (i) the inputs and assumptions behind deriving a discount rate range of 11.3% to 14.1%, including inputs for target capital structure, unlevered asset betas for certain companies deemed by Citi to be comparable to Dermira, and the equity market risk premium and yields for U.S. treasury notes; (ii) the estimated terminal values; and (iii) the assumptions behind selecting a range of perpetuity growth rates of negative 30.00% to negative 20.00%.

29.     Similarly, with respect to SVB Leerink's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose: (i) the inputs and assumptions behind deriving a

discount rate range of 11.0% to 13.0%, including inputs for target capital structure, levered and unlevered betas for certain companies deemed by SVB Leerink to be comparable to Dermira, and the equity market, risk premium and yields for U.S. treasury notes; (ii) the assumptions behind applying an estimated after-tax cost of debt of 8.5%; (iii) the estimated terminal values; and (iv) the assumptions behind selecting a range of perpetuity growth rates of negative 30.00% to negative 20.00%. Further, the Recommendation Statement fails to explain how Citi and SVB Leerink derived different discount ranges from the same data inputs and using the same weighted average cost of capital method.

30.     These key inputs are material to Dermira stockholders, and their omission renders the summaries of Citi's and SVB Leerink's *Discounted Cash Flow Analyses* incomplete and misleading. As one highly respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Without the above-mentioned information, Dermira stockholders cannot evaluate for themselves the reliability of the *Discounted Cash Flow Analyses* and make a meaningful determination of whether the implied equity value per share ranges reflect the true value of Dermira or was the result of an unreasonable judgment by Citi and/or SVB Leerink, and so cannot make an informed decision regarding whether to tender their shares.

31.     Furthermore, the Recommendation Statement omits material information regarding the *Additional Factors Observed by Citigroup Global Markets Inc. and SVB Leerink LLC*. In disclosing the premiums paid in 11 selected therapeutic-focused biopharma transactions, the Recommendation Statement omits: (i) Citi's and SVB Leerink's rationale and basis for including transactions valued at $500 million to $2 billion; (ii) the individual companies acquired in each transaction and the value of the company implied by the transaction; (iii) the date of each transaction; (iv) whether each transaction involved cash consideration, stock consideration, or a cash/stock mix; and (v) the premium paid in each transaction. Similarly, the Recommendation Statement also omits the individual price targets selected, and identity of those analysts, in calculating the range of the target stock price.

32.     Merely providing the low, high, mean, and median equity values that a banker calculated is insufficient, as stockholders are unable to assess whether the banker utilized reasonable comparable companies, or, instead, selected unreasonable companies in order to make the Offer Price appear more favorable. *See, e.g. In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 449-450 (Del. Ch. 2002) (emphasizing that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely" and that "[t]he real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation

analysis that buttress that result."). Therefore, this information must be disclosed prior to the looming Expiration Time.

33.    **Second**, the Recommendation Statement indicates that Dermira and multiple parties entered into confidentiality agreements. Yet, the Recommendation Statement fails to fully disclose Dermira's confidentiality arrangements as to all the potential bidders, including whether those agreements contained DADW clauses, and whether they were waived or still remain in effect.

34.    The Recommendation Statement indicates that Lilly, Company D, Company G, and Company K entered into confidentiality agreements containing customary standstill restrictions and that the confidentiality agreements among these parties were similar. However, the Recommendation Statement also discloses that it entered into a confidentiality agreement with Company A but fails to identify this confidentiality agreement as similar to the others. Therefore, it is unknown whether Company A's agreement contained restrictive DADW clauses. Likewise, as to all the 18 interested parties, the Recommendation Statement omits which of these parties were subject to confidentiality agreements, other than those identified above. It is material to shareholders that if some potential bidders were subject to restrictive DADW clauses, but others were not, then there could be a clear preference for one bidder over another.

35.    Accordingly, the express communication of the existence of such provisions is material to Dermira shareholders, as it bears directly on the ability of parties that expressed interest in acquiring the Company to offer them a better deal. The failure to plainly disclose the existence of DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. If those non-disclosure agreements contained DADW provisions, then those parties could only make a superior proposal by (i) breaching the

agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly; or by (ii) being released from the agreement during the Go-Shop Period. Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information. Thus, the omission of this material information renders the descriptions of the confidentiality agreements the Company entered into in the *Background of the Merger* section of the Recommendation Statement misleading.

36.     In sum, the omission of the above-referenced information renders the Recommendation Statement materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the Expiration Time, Plaintiff will be unable to make an informed decision regarding whether to tender his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### Against All Defendants for Violation of Section 14(e) of the Exchange Act

37.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

38.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

39.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which

they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40.    The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer and the intrinsic value of the Company.

41.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e). The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

42.    The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

43.    Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements

therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

44.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Time.

## COUNT II

### Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9

45.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

46.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Tender Offer.

47.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

48.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or

recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

49.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

50.     The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9(d) if other SEC regulations specifically require disclosure of the omitted information.

51.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.  Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Tender Offer, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

52.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## COUNT III

**Against all Defendants for Violations of Section 20(a) of the Exchange Act**

53.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.    The Individual Defendants acted as controlling persons of Dermira within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Dermira, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

55.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Tender Offer. They were thus directly involved in preparing the Recommendation Statement.

57.    In addition, as the Recommendation Statement sets forth at length, and as described

herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

58.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

60.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Tender Offer, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff, the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

     D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: January 24, 2020                   **MONTEVERDE & ASSOCIATES PC**

                                         */s/ Juan E. Monteverde*
                                      Juan E. Monteverde (JM-8169)
                                      The Empire State Building
                                      350 Fifth Avenue, Suite 4405
                                      New York, NY 10118
                                      Tel: (212) 971-1341
                                      Fax: (212) 202-7880
                                      Email: jmonteverde@monteverdelaw.com

                                      *Attorneys for Plaintiff*